## STOUT v. NEHI BOTTLING CO.
### No. 1128.

Court of Appeal of Louisiana. First Circuit.
March 7, 1933.

C. V. Pattison and E. F. Gayle, both of Lake Charles, for appellant.

Pujo, Bell & Hardin, of Lake Charles, and W. H. Talbot, of New Orleans, for appellee.

MOUTON, Judge.

A collision occurred June 26, 1931, about three miles west of the village of Iowa, Calcasieu parish, on the "Old Spanish Trail" between a De Soto sedan automobile E. Breaux was driving in an easterly direction and a Ford truck which was being driven by Charles Hooper, going westward, at the time, and therefore in the opposite direction.

Elsie Marie Stout, a child aged six, and her sister, Frances Ruth, three years older, were riding in the sedan car as the guests of E. Breaux; so was Miss May Stout, a niece of Mr. Breaux. Elsie Marie was severely injured as a result of the collision, and her sister, Frances Ruth, was killed. Miss May Stout, the niece, also suffered an injury, but is not a litigant in this suit which is brought against defendant company by Mr. and Mrs. David Stout, the parents of Elsie and Frances Ruth Stout.

Mr. David Stout and his wife are claiming damages in the sum of $20,000; Mr. David Stout for the benefit of Elsie Marie, his minor daughter, $19,000; and for David Stout $1,380.88, making a total of $40,380.88, with legal interest.

The district judge, on the first trial, rendered judgment for a smaller amount than claimed, thereafter granted a new trial, reversed his original judgment, and rejected the demands.

Plaintiffs appeal.

## New Trial.

An application for a new trial was first made on the ground that the judgment rendered was contrary to the law and the evidence.

A second application for a new trial was filed by defendant company in which, among other averments, it was alleged that Breaux, as appeared in his affidavit annexed to the application, had stated that the driver of the truck for defendant company was so close when he turned to his left on the highway that he "had no chance of avoiding hitting him"; that he saw the truck too late to avoid the accident, which could not be attributed to the fault of the driver of that truck.

In its original opinion, the court had said that the testimony of Breaux, which had not been taken on the first trial, but which had been referred to in argument, could probably have no effect on the outcome of the case.

In the opinion on the second application, the court said it might·have been in error in so expressing itself in its original opinion, and took occasion to remark that it was its duty to use all reasonable means to obtain all the evidence in the case.

■■ The general recognized rule is that motions for new trials are addressed to the sound legal discretion of the court, and should never be granted, "unless the application discloses matter sufficient to render it probable that justice has not been done and that a re-examination would vary the result." This rule has been recognized in our earliest decisions. See Roberts v. Rodes, 3 Mart. (N. S.) 100; and has since been adhered to in many decisions which we find unnecessary to cite.

■ Counsel for plaintiffs say that defendant's counsel had in their possession the affidavit of Breaux annexed to their second application prior to the original trial of the case, and could not claim that it was newly discovered evidence to entitle their client to a new trial.

It will be observed that the first application for the new trial was grounded on the averment that the judgment was contrary to the law and the evidence.

It will be noted also in connection therewith that the court in its opinion granting the new trial, after stating that the evidence of Breaux should be obtained, said: "In any event, it is thought proper that a re-consideration of the case is desirable." This expression of the court indicates that it entertained serious doubt as to the correctness of its original judgment, independently of the testimony Breaux might give. It is also true that in ordering the new trial the court said it was granted for the sole purpose of obtaining the testimony of Breaux, and that if his evidence could not be obtained (quoting), "then the case is to be considered as re-opened for re-hearing only." This last-quoted expression of the court shows again that the court was in doubt about justice being rendered in the original judgment, and desired to have the case reopened for a second hearing on the original evidence. In addition thereto, there can be no doubt that the statements of Breaux in his affidavit which was annexed to the second application for 'the rehearing disclosed matters sufficient to render it probable that justice had not been done and "that a re-examination of the case would vary the result."

■ The rule is also well established that the granting of a new trial is within the sound legal discretion of the trial court, and that appellate courts never interfere in such cases, unless there is manifest error or an abuse of discretion. Instead of so finding, we are of the opinion that the discretion vested below was properly exercised.

## Merits.

Mr. Breaux appeared in the new trial and testified as a witness. The original judgment was reversed, and the demands of the plaintiffs were rejected, as is hereinabove stated.

■ At the outset it may be proper to state that no negligence of which Breaux might have been guilty could be imputed to the two little girls, victims of the accident.

The accident occurred on the Spanish Trail, which has a pavement of 18 feet and is 24 feet wide, including the shoulders of the highway. It is shown that Breaux, while following a Ford car which was also traveling eastward, suddenly darted his sedan across the roadway, northward, ran against the guard rail along the road on that side, in front of the on-coming truck which was going westward, and which ran into the sedan auto. Hence it is clear, and not disputed, that Breaux was at fault, and the sole question presented for determination is as to whether or not Charles Hooper, driver of the truck, was also guilty of contributory negligence.

■ Miss Rosie May Stout was riding on the front seat with Mr. Breaux in the sedan auto, while the two little girls, Elsie and Frances Ruth, who lost her life, were in the rear of the car. They were going at a speed

of about 35 miles an hour, and were running behind a Ford car going eastward in the same direction, which Mr. Desjardin was driving, at the rate of about 20 miles an hour. Mrs. Desjardin was sitting with him on the front seat, and Mr. Deshotel was also riding in the Ford.

Breaux was going at 35 or 40 miles an hour, and, before he caught up with the Ford, a Dodge car passed ahead and got between his sedan and the Ford, kept on going, and went around the Ford. As to the facts above stated showing the relative positions of these cars and that the Dodge drove around the Ford, there is no conflict in the testimony.

Breaux testifies that, as he intended to go around the Ford, he followed the Dodge car, and that when he pulled in the road saw the truck coming "way out," which he estimated was then 350 or 400 feet from him. He had then, according to his testimony, gotten on the side of the Ford, was "even" with it, and that the Dodge car, which was going at about the same speed Breaux was traveling, was about 30 or 40 feet ahead of Breaux. Thinking then, he says, that he might not be able to swing around the Ford and ahead of it in time to let the truck go by, he slapped his breaks on and his auto skidded across the highway when the Dodge car was just passing the truck, and his auto struck the guard rail on the north side of the roadway. While his car was jammed against this guard rail, the evidence shows that the truck ran into his auto, inflicting the damages complained of. He said that, when his auto skidded across the highway, the Dodge car was just passing the truck, which was then at a distance of 350 or 400 feet from his, or a city block away. Evidently it must have taken barely a second in point of time for his auto to go across the roadway and to be jammed against the guard rail. When it became so jammed, the truck must then have been not less than 300 feet from his auto, according to his testimony, and no doubt, if that were true, that its driver would have had ample time to stop or could have passed in the rear of Breaux' auto where there was then no obstacle whatsover, as far as is disclosed by the record. The fact is that Breaux testifies he had his eyes on the driver of the truck at the time, and says he did not move his feet and made no attempt to stop or to pass in his rear.

It is not believable that Hooper, the driver of that truck, in the afternoon of a clear day, the condition existing when this accident occurred, would under such circumstances have "held his truck on the road," as testified to by Breaux, and would have deliberately run into the Breaux car, jammed as it was against that guard rail.

It is shown by the testimony of Mr. Caruthers, deputy sheriff of Calcasieu parish, that he saw Mr. Breaux at the hospital in Lake Charles the night of the accident, where he had gone to get the details of the occurrence in the discharge of his official duties. His testimony is that on that occasion Mr. Breaux gave him the details of the accident that had happened when the truck ran into his auto. In that statement, as testified to by Mr. Caruthers, Mr. Breaux said that as he was going around the car, his car skidded, and he went across the road, that he was too close to the car coming and could not avoid being hit.

Mrs. Mary Hooper, mother of the truck driver, testified that Mr. Breaux, while in a rolling chair at the hospital, made a similar statement to her.

In the affidavit by Mr. Breaux attached to the second application by defendant for a new trial, he states that, seeing he could not pass the Ford car which was ahead of him, he applied his brakes, and that his car swerved to the left directly in front of the approaching truck, which was so close that the driver of the truck had no chance to avoid hitting him. The affidavit was taken before Miss Krutz, notary public, was read to Mr. Breaux, who, on account of his bandaged hand, allowed his mark to be affixed to the instrument. There is not the slightest evidence to show that the affidavit had been obtained by inducement or by any unfair means. It also appears that his statement to Mr. Caruthers and Mrs. Hooper was free and voluntary.

Counsel for plaintiffs say in their supplemental brief between the statement made by Mr. Breaux in his affidavit and his testimony on the new trial, the difference is that in the statement he said the truck driver was not negligent, and in his testimony he concluded that he was.

If we have a correct appreciation of the position taken by counsel in reference to the statement of Mr. Breaux and his testimony referred to, the contention is that no facts were admitted by Mr. Breaux either in the affidavit or his testimony, but merely an admission of negligence in the statement and a denial thereof in his evidence.

In his affidavit and in his testimony, he said that, when his auto skidded across the roadway, he was too close to the on-coming truck to get out of its way to avoid the accident. This statement of being too close to the truck to get out of its way carried an admission of fact upon which he based his admission of negligence, and hence we cannot concur in the views of counsel presented in their argument on this point.

This admission by Mr. Breaux that he was too close to the truck when he skidded to avoid the collision brings us to the consideration of the testimony of the other witnesses on that question, which presents the pivotal issue in this contest.

Miss May Stout was riding on the front

seat of the sedan with Mr. Breaux, her uncle. Her testimony is that the Dodge car got between the sedan and the Ford; that the Dodge drove around the Ford; that her uncle followed the Dodge, and, as he was about to pass in front of the Ford, she saw the truck coming, which was then about a city block away, a distance she fixed of about 400 feet. Asked if Mr. Breaux had then the time to pass the Ford and avoid the truck car, she answered she did not know.

It is obvious that, if the truck was at that distance from the sedan when Mr. Breaux was about passing in front of the Ford, he would have had ample time to pull his car to his right side in front of the Ford and to have safely passed the truck. Besides, as we have hereinabove remarked in passing on the testimony of Mr. Breaux, it could not be believed that the driver of the truck who could also have seen the sedan at the time Miss May Stout testifies she saw the truck would, after having seen the car at that distance, continued on his way without stopping, or attempting to stop, before running into the sedan, jammed as it was against the guard rail.

As Miss May Stout has no recollection of anything that occurred after the sedan darted across the highway, we shall pass her testimony without further comment.

Mr. Desjardin, witness for plaintiffs, was driving the Ford car which figures so prominently in the discussion of this case. He was traveling at about 20 miles an hour, and saw the Dodge car as it passed around his car; the speed of the Dodge, at that time, being about 35 or 40 miles an hour. Mr. Desjardin saw the truck coming towards his car, and testifies that this Dodge had then "plenty of room to get by" without striking the truck. Asked if, after the Dodge car had passed him, whether there was room for another car to go around his car and pass the truck safely, his answer to that question was: "No"; and further, according to his own language: "Well it did not look like to my mind he wouldn't have time—that a man couldn't pass and not strike the truck—Looked impossible to me."

This answer indicates that the truck was then in close proximity to his car, otherwise Mr. Desjardin would not have expressed himself by saying it "looked impossible" to him that another car could have passed ahead without striking that truck.

Mrs. Desjardin was sitting on the front seat of the Ford, and said she remembered when a car passed ahead of their car before the accident, referring, evidently, to the Dodge. At that time she heard a car blowing behind them which was also heard, the record shows, by Mr. Desjardin; Mr. Deshotel saying that he heard a scraping sound. She testified, without equivocation, that the car behind her had no time to pass ahead of her car and avoid the truck; and that this idea occurred to her at the time.

Mr. Deshotel's testimony on this subject is that he was doubtful as to whether another car could have gone around their car safely following the Dodge car that had passed ahead.

As we have before stated, Mr. and Mrs. Desjardin were sitting on the front seat of the auto, and evidently Mr. Deshotel must have been occupying the rear. The two in front had a better opportunity than had Mr. Deshotel to see exactly what transpired, and their statement that no other car going around the Ford had time to get by without colliding with the truck must be accepted as being the real situation existing at that time. This is particularly true of the driver, Mr. Desjardin, upon whom rested the responsibility of driving the car, and which naturally should have prompted him to look ahead for his own protection and for the safety of the others who were riding with him.

The testimony of Mr. Breaux is that, when his car skidded, he was too close to the approaching truck to avoid the collision. His testimony is in keeping on this point with the evidence of Mr. and Mrs. Desjardin, and is not contradicted by the evidence of Mr. Deshotel. When he skidded, it was then that he first saw the truck, which was not then 350 or 400 feet from him, as we have heretofore shown. He was then close to the truck, as it is clearly shown that he could not have gone safely around the Ford without colliding with the on-coming truck.

The only evidence conflicting with the evidence above referred to showing that the Breaux car was close to the truck when it darted across the highway comes from the testimony of Mr. Desjardin and Mr. Deshotel, who say that, when they heard the crash between the truck and the Breaux car, their car was then 90 or 100 feet away from the point where the crash occurred.

This crash took place in the rear of their car, they were not looking behind, rather in the opposite direction, certainly did not see the collision and evidently formed their idea of the distance from the noise resulting from the crash. This testimony affords an unsatisfactory criterion for the determination of the distance then intervening between the sedan and the truck, when the sedan went across the highway in front of the truck. The distance which existed between these two vehicles, at that time, must be ascertained as near as possible in order that we may say whether Hooper, the truck driver, saw the sedan in time or should have seen it, and failed to stop the truck, to diminish its speed, or to make the proper effort to avoid the accident.

The evidence of Mr. Desjardin, Mrs. Desjardin, and Breaux, above referred to, shows that Mr. Breaux did not have the time to go

around the Ford and to proceed ahead of it without colliding with the on-coming truck. That testimony shows that the truck was quite close to the Ford when Mr. Breaux' car skidded across the highway. The testimony of those witnesses does not fix the distance which then separated the sedan from the truck. The other party who had a good, if not the best, opportunity to see how the accident really happened, was Charles Hooper, the driver of the truck.

He says he was going westward and noticed a car approaching and in the act of passing a slow-moving car, which evidently was the Ford; that he regulated his speed to let that car pass his truck and then continued on his way; that he saw the Breaux car behind the slow-moving car nearing the Ford; that Breaux dodged beck of it; and that about the time he got even with the Ford car the Breaux car "slid sideways in front of me." Mr. Breaux stated that his car had skidded across while he was on the side of the Ford, and that he was not behind the Ford at that time.

In that respect there is a discrepancy between the statements of these two witnesses. Hooper says, however, that, when Breaux skidded in front of him he was at that time between 20 and 30 feet from Breaux. Breaux did not fix the distance which then intervened between the two vehicles, but said he was so close to the truck that its driver could not avoid "hitting him." This statement implies that they were in very close proximity to each other, and is not suggestive of any inference that could authorize the conclusion that the distance estimated by Hooper is not correct.

It is shown by the evidence of most of the witnesses that the Breaux car, in attempting to go around the Ford, was closely following the Dodge car. As such was then the situation, it is reasonable to infer that the Dodge car blocked the vision of Hooper, the driver of the truck, who, when the Dodge rounded the Ford, saw, to his surprise, the Breaux car, which was unexpectedly running sideways across the highway and in front of the truck.

Section 15(a), Act No. 296, 1928, reads as follows: "The driver of a vehicle shall not drive to the left side of the center line of a highway in overtaking and passing another vehicle proceeding in the same direction unless such left side is clearly visible and is free of oncoming traffic for a sufficient distance ahead to permit such overtaking and passing to be made in safety."

It is manifest here that Mr. Breaux was clearly at fault in turning to his left for the purpose of passing ahead of the Ford car which was traveling in the same direction without first ascertaining that the left side was free of on-coming traffic. Such being the statutory provision on this subject, when Hooper saw the Dodge car coming towards him, he certainly could not have anticipated that the driver of another car would be following the Dodge car with a view of going around the Ford and in the path of the truck.

Hooper says he regulated his speed to let the Dodge pass, and then continued on his way. He was not guilty of the slightest negligence in pursuing that course.

■ Mr. Desjardin says the truck was going real fast, and Mr. Deshotel, although admitting it was difficult to fix the speed of the truck, says that he imagined it was going at about 45 or 50 miles an hour.

The truck, as appears from the evidence, was advancing towards these two witnesses. We have had occasion to say in prior decisions that it was impossible under such circumstances to fix with any degree of certainty the speed at which an auto was coming towards the party attempting to estimate its rate of speed. We find no reason to change our views on this subject, and will again say that no reliance can be placed in such estimates of speed.

Hooper, who was driving the truck, says he was going at about 30 or 35 miles an hour at the time. He was in a much better position than were the other witnesses to know at what rate of speed he was traveling. Under such testimony the proof fails to show that Hooper was traveling at an excessive rate of speed. On the contrary, the proof sustains the view that he was moving within the statutory limit of speed.

It is shown that Hooper had a chauffeur's license, and had been driving a truck for defendant company some two years before that accident. There is no evidence whatsoever to indicate that he had been drinking or was in a condition impairing his capacity as a driver of an auto or truck. He says his truck was in good condition and that he was looking ahead, and there is no evidence or circumstance to indicate that he was not.

Hooper was asked by counsel for plaintiffs if he had made any effort to stop after he saw Mr. Breaux' car. His first answer to that question was as follows: "I didn't have time." The same answer was given by Hooper to the same question which was propounded several times. As Hooper had testified that he saw the Breaux car when 20 or 30 feet from it, the question was renewed in this form, quoting: "Couldn't you have stopped it (truck) when in 20 feet or approximately 30 feet?" He answered: "If I had known that I would have to stop I could have, but this car flashing in front of me 20 or 30 feet ahead of me directly in front of me, I did not have time to even think to do anything."

Evidently, if he had known he had to stop under such conditions, he could have stopped within the space indicated. Such was not the situation, however. When that sedan dashed all at once and unexpectedly across the highway, such a sudden and unusual emergency confronted Hooper that he must have been amazed and stupefied. No doubt he was temporarily unnerved, had no time to think, as he naively stated, and did not apply his brakes. Having failed to make the usual efforts to stop the truck which one would ordinarily do to avoid an accident, under the circumstances above stated, can it be said that Hooper was at fault or contributed to the accident?

He said he did not have the time to think about applying his brakes or to make any effort to stop his truck or to diminish his speed. There is no doubt that a mere second of time or perhaps less intervened between the moment he first saw the sedan and the time he ran into it, as it was jammed against the guard rail. Surprised as he must have been when the sedan dashed across the roadway, we do not think it can be said that he was in any way negligent or at fault.

It has been held by this court, and by other courts, that, when the driver of an auto is by the fault of another suddenly confronted by an emergency, and is compelled to act instantly to avoid a collision, he is not guilty of negligence if he makes such a choice as a person of ordinary prudence might make, even though he did not make the wisest choice. Martin v. Cazedessus, 15 La. App. 100, 130 So. 129; Testard v. Board of Commissioners, Port of Orleans, 8 La. App. 238.

In such a case, and those of similar nature, when a driver is confronted with two hazards, if he does not choose the wisest course in his effort to avoid a collision, he cannot be charged with negligence.

In the instant case, the hazard was so sudden, unusual, and unexpected that, between the time of the sudden appearance of the danger and the impact of the truck with the sedan, Hooper had really no time to think and to select any course, either by applying his brakes or otherwise, to avoid the imminent danger with which he was threatened.

Evidently the court so found on its re-examination of the case on the new trial, and came to the conclusion that its first judgment in favor of plaintiff was erroneous.

We have examined this case with the greatest care possible, and have been unable to find any error in the second judgment reversing the original judgment and rejecting the demands of the plaintiffs, and which is therefore affirmed, with cost.